# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUCIO GOMEZ,<br><br>        Plaintiff,<br><br>      v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:16-cv-0700 – JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF LUCIO GOMEZ AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Lucio Gomez asserts he is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in finding his mental impairments were not severe. Because the ALJ failed to apply the proper legal standards and erred in evaluating the medical record, the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

Plaintiff filed his applications for benefits on July 16, 2012, alleging disability beginning on December 15, 2011. (Doc. 9-3 at 11) The Social Security Administration denied the applications at both the initial level and upon reconsideration. (*See generally* Doc. 9-4) After requesting a hearing, Plaintiff testified before an ALJ on September 25, 2014. (Doc. 9-3 at 11, 30) The ALJ determined

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

1

Plaintiff was not disabled and issued an order denying benefits on December 30, 2014. (*Id.* at 11-22) The Appeals Council denied Plaintiff's request for review on March 22, 2-16. (*Id.* at 2-4) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

2

the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.    Relevant Medical Evidence**[2]

In March 2011, Plaintiff visited Saint Agnes Medical Center, and reported that he had suffered depression and anxiety for one year. (Doc. 9-9 at 11) He did not identify any psychological or developmental issues. (*Id.*)

In August 2012, Plaintiff told Alisia Lee, PA-C, that he had "mild depression, but more so anxiousness thru out [sic] the day with difficulty sleeping at night." (Doc. 9-10 at 32) Ms. Lee diagnosed Plaintiff with Anxiety Disorder, not otherwise specified, and prescribed Paxil. (*Id.* at 34)

In October 2012, Plaintiff reported he was "feeling tired" and he was "upset that he [had] many health problems." (Doc. 9-10 at 7) Daniel Villegas, PA-C, also opined Plaintiff had Anxiety Disorder, not otherwise specified. (*Id.* at 9)

Plaintiff was referred to Martina Acevedo, LCSW, for a behavioral health consultation, which occurred on December 10, 2012. (Doc. 9-13 at 47; Doc. 9-14 at 9-10) Ms. Acevedo noted:

> [Plaintiff] identifies with 12/13 [symptoms] on handout for depression for the last 1.5-2 years, including: irritability, sadness, sleeping too little, a lack of interest in others and in activities [he] usually enjoys, feelings of guilt, worthlessness, inadequacy, hopelessness, helplessness, loss of energy/feeling tired most of the time, difficulty concentrating or making decisions, fluctuating appetite and weight, feeling very slowed

---

[2] While the Court has reviewed the entirety of the medical record, Plaintiff challenges the evaluation of medical evidence related to his mental impairments. Accordingly, the summary excludes any evidence related to his physical impairments.

3

> down, physical complaints – aches and pains, thoughts of death as fantasy escape, and isolating from others.

(Doc. 9-14 at 9) Plaintiff told Ms. Acevedo that he was "worrying more lately than usual," and had a "sense of impending doom without apparent reason every morning." (*Id.*) Ms. Acevedo noted Plaintiff did not demonstrate any abnormalities of behavior, but his mood was depressed, anxious, and irritable. (*Id.*) Ms. Acevedo opined Plaintiff had Depressive Disorder and Anxiety Disorder. (*Id.* at 9-10)

Later in December 2012, Plaintiff reported feeling fatigued and "being very depressed and not wanting to do anything." (Doc. 9-3 at 44) Mr. Villegas observed that Plaintiff's "affect was abnormal" and depressed, though Plaintiff's mood improved by the end of the evaluation. (*Id.* at 46) Mr. Villegas opined Plaintiff had "major depression." (*Id.* at 47) At a therapy session with Ms. Acevedo, Plaintiff reported he felt depressed, anxious, and irritable "most days, all day." (*Id.* at 41) On a "scale of one to ten, [with] 10 being the strongest," Plaintiff rated each symptom as "8." (*Id.*) He also continued report a "sense of impending doom" and worrying. (*Id.*) In addition, Plaintiff's wife reported that Plaintiff was "more tired and lethargic than she …ever remembered him to be" after he started taking Paxil. (*Id.*) Ms. Acevedo opined Plaintiff had Anxiety Disorder, not otherwise specified, and "Major Depressive Disorder, Single Episode, Severe w/o Psychotic Features." (*Id.* at 42)

Dr. Roger Izzi performed a consultative psychiatric evaluation on January 5, 2013. (Doc. 9-12 at 35) Plaintiff told Dr. Izzi that his impairments include depression, anxiety back problems, and arthritis. (*Id.*) In addition, Plaintiff reported he had sleeping difficulties due to back pain and restlessness. (*Id.*) Dr. Izzi observed that Plaintiff "was fully oriented" because he "could identify the year, month, and date," as well as "state without difficulty, the state and city he was in." (*Id.*) Dr. Izzi also noted Plaintiff's "affect was dysphoric" and "[h]e seemed edgy." (*Id.*) Dr. Izzi tested Plaintiff's immediate and delayed recall by asking him to recall three words. (*Id.* at 37) Plaintiff "was able to immediately recall three words without any obvious difficulty," and "[u]pon delayed recall, he was able to recall two of the three words." (*Id.*) Plaintiff had "no difficulty recalling five digits forward or three digits backward." (*Id.*) Further, Dr. Izzi noted that Plaintiff "had no difficulty spelling the word 'world' forward, but committed two errors spelling 'world' backward." (*Id.*) Dr. Izzi diagnosed Plaintiff with Depressive Disorder, not otherwise specified. (*Id.*) Dr. Izzi opined:

> The present evaluation suggests, that on a purely psychological basis, the claimant does appear capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period. His ability to get along with peers or be supervised in [a] work-like setting would be moderately limited by his mood disorder. The claimant's mood disorder can be expected to fluctuate as his subjective perception of pain fluctuates. Any significant fluctuation [of] mood would limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period. On a purely psychological basis, the claimant appears capable of responding to usual work session situations regarding attendance and safety issues. On a purely psychological basis, the claimant appears capable of dealing with changes in a routine work setting.

(*Id.* at 37-38) Dr. Izzi also opined Plaintiff's "cognitive functioning remain[ed] intact," and he gave Plaintiff a GAF score of 68.[3] (*Id.* at 37)

Dr. Deborah Hartley reviewed the record on January 14, 2013, and noted Plaintiff had "Affective Disorders." (Doc. 9-4 at 21) She found Plaintiff's memory was intact, noting he was "[a]ble to spell world forward." (*Id.*) According to Dr. Hartley, Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. (*Id.*) Dr. Hartley opined Plaintiff's results from the examination with Dr. Izzi indicated he had "mild limitations in his global functioning." (*Id.* at 22) She concluded Plaintiff's mental impairments were "Non Severe." (*Id.* at 21)

In January 2013, Plaintiff's prescription was changed from Paxil to Bupropion. (Doc. 9-13 at 28, 33) However, on January 22, Plaintiff reported the medication was "making him feel more anxious and overwhelmed." (*Id.*) At a therapy session with Ms. Acevedo, she observed that Plaintiff was depressed, anxious, and irritable. (*Id.* at 33) She believed Plaintiff's insight remained impaired. (*Id.*) Ms. Acevedo referred Plaintiff to a physician "for discussion of [an] alternate antidepressant," after which Plaintiff's prescription was changed from Bupropion to Zoloft. (*Id.* at 28, 33-34)

In February 2013, Plaintiff "was hospitalized unexpectedly due to intestinal problems," and he remained in the hospital for five days. (Doc. 9-13 at 23) Plaintiff told Ms. Acevedo that while he noted a difference "after a couple of weeks of being on Zoloft," he stopped taking all medication when he got out of the hospital because he wanted "to get rid of [the] intestinal pain." (*Id.*) Ms. Acevedo

---

[3] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

observed that Plaintiff's mood appeared less depressed and anxious than previously observed, but he remained irritable and had impaired insight. (*Id.*)

Dr. Jennifer Kawase conducted an initial psychiatric evaluation on March 5, 2013. (Doc. 9-13 at 16) Plaintiff reported that he had "a lot of anxiety and depression, which worsened "in[] the last 2.5 years after medical problems got worse." (*Id.*) Plaintiff also told Dr. Kawase that he had been taking Zoloft, which "did help with mood and anxiety," but stopped when he got diverticulitis. (*Id.*) Plaintiff said his energy was poor and his concentration was "not good." (*Id.*) Dr. Kawase opined that Plaintiff had "some paranoia," limited insight, and limited judgment. (*Id.* at 16, 18) Dr. Kawase diagnosed Plaintiff with Depressive disorder exacerbated by General Medical Condition and Anxiety disorder. (*Id.* at 21) She indicated Plaintiff had "moderate/severe" stressors on the *DSM-IV* assessment and gave Plaintiff a GAF score of 55.[4] (*Id.*) Dr. Kawase prescribed Zoloft and directed Plaintiff to increase the amount after two weeks as tolerated. (*Id.*) In addition, she recommended that Plaintiff stop drinking alcohol, informing him that "usage can exacerbate anxiety and mood symptoms and decrease inhibitions and can interact with medications." (*Id.* at 22)

Plaintiff had a psychiatric appointment with Dr. Kawase on May 7, 2013. (Doc. 9-13 at 7, 10-15) He described "passive" suicidal ideations when a crisis hit, explaining he "[j]ust gets tired of it." (*Id.* at 10) Plaintiff said he had no motivation and was "not enjoying much." (*Id.*) Dr. Kawase opined Plaintiff's mood was depressed and his affect was constricted. (*Id.* at 11-12) In addition, she believed Plaintiff had limited insight and judgment. (*Id.* at 12) Dr. Kawase diagnosed Plaintiff with Depressive disorder exacerbated by General Medical Condition and Anxiety disorder. (*Id.* at 13) She gave Plaintiff a GAF score of 55. (*Id.* at 14)

On May 10, 2013, Plaintiff told Ms. Acevedo that he was "not drinking any [alcohol] to help manage [his] anxiety any longer." (Doc. 9-13 at 7) Ms. Acevedo observed Plaintiff was "talking as though he [was] starting to be interested in activities again that would draw his attention before," and his "motivation levels [had] slightly increased, although energy not quite at the same level." (*Id.*) For example, Plaintiff said he would "think of going out to [a] store or to do something, [his] wife gets

---

[4] A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *DSM-IV* at 34.

6

ready, and then [he] loses interest and energy to carry activity out." (*Id.*) Ms. Acevedo found Plaintiff's mood was depressed, anxious, and irritable, but "[l]ess than previously observed." (*Id.* at 8)

Dr. A. Garcia reviewed the record and affirmed the initial decision that Plaintiff's mental impairments were non-severe on June 5, 2013. (Doc. 9-4 at 44)

On July 18, 2013, Plaintiff reported he had "low libido and depression," and his "physical activity tolerance recently decreased." (Doc. 9-18 at 47, 48) The following day, he told Ms. Acevedo that he had a "slightly improvement in energy levels in the morning for about three hours after he takes his morning medications that include Celexa and Ability." (*Id.* at 44) Plaintiff told Ms. Acevedo that he had "a tiny bit" of improvement with his anxiety and irritability, and fewer paranoid thoughts. (*Id.*) Further, Plaintiff's wife reported he had "more energy because he [had] been helping with washing the dishes, sweeping, and doing things around the house." (*Id.*) Ms. Acevedo observed that Plaintiff had "difficulty remembering which medication is which," but appeared "more relaxed and less irritable." (*Id.* at 44-45)

Plaintiff had an appointment with Dr. Kawase on October 11, 2013 and said he was feeling "somewhat better" since his last appointment. (Doc. 9-18 at 34) Dr. Kawase opined Plaintiff had a fair attitude; linear thought process; and a constricted affect, which lessened as the appointment continued. (*Id.* at 34) She also believed Plaintiff had limited insight and judgment. (*Id.* at 36) Dr. Kawase opined Plaintiff continued to have "moderate/severe" stressors, and she and gave him a GAF score of 55. (*Id.* at 37) Plaintiff was directed to return continue therapy sessions, and to return in three months. (*Id.*)

On January 9, 2014, Dr. Kawase noted that Plaintiff appeared "somewhat flustered," with a depressed mood and tired affect. (Doc. 9-18 at 21) She noted Plaintiff had lost ten pounds, and "appeared somewhat older than stated age." (*Id.*) Dr. Kawase prescribed Remeron to "help with sleep, increase appetite." (*Id.* at 22) At a therapy session the same month, Plaintiff "denie[d] noticing any difference in terms of his energy levels" while taking Remeron, but his "wife notice[d] that his appetite [was] better." (*Id.* at 17)

In March 2014, Plaintiff told Dr. Kawase that his energy was poor and his concentration was "not great." (Doc. 9-18 at 13) Dr. Kawase observed Plaintiff's thought process was linear, judgment was fair, and insight was limited. (*Id.* at 14) She increased Plaintiff's dosage of Abilify and said he

7

should continue with therapy, as it was part of his treatment plan. (*Id.* at 15)

Dr. Kawase saw Plaintiff for the last time in June 2014. (Doc. 9-18 at 4) Plaintiff said he had racing thoughts, shook from anxiety once or twice a week and had "a little bit" of irritability. (*Id.*) According to Dr. Kawase, Plaintiff's attitude seemed fair, though his mood was "worn down." (*Id.* at 6) She opined Plaintiff's insight was limited and his judgment was fair. (*Id.*) She also observed that Plaintiff had a "mild tremor" in his left hand. (*Id.*) She noted Plaintiff's diagnoses included: "Major depressive disorder, recurrent episode, unspecified;" "Anxiety state, unspecified;" and "malaise and fatigue." (*Id.*) Dr. Kawase gave Plaintiff a GAF score of 50.[5]

In September 2014, Plaintiff had a therapy session with Ms. Acevedo, who noted that Dr. Kawase had left the agency. (Doc. 9-18 at 2) Plaintiff told Ms. Acevedo that "[n]early every day" he had little interest or pleasure in doing things, trouble with sleep, felt tired or had little energy, and had a poor appetite. (*Id.*) He also reported "[m]ore than half the days," he felt down, depressed, or hopeless. (*Id.*) Plaintiff said he did not have trouble concentrating, but he reacted slowly or became fidgety and restless. (*Id.*) Plaintiff said he felt "tired all the time" and sometimes felt "like it takes more energy to eat than . . . [he] is hungry." (*Id.*) Ms. Acevedo opined Plaintiff had "Moderately Severe Depression." (*Id.*)

**B.    Administrative Hearing Testimony**

Plaintiff testified that he worked for thirty-three years as a welder, after which he went to school to earn a certificate in industrial maintenance. (Doc. 9-3 at 38-39) Plaintiff said he was no longer able to work due to arthritis, depression, and anxiety. (*Id.* at 36, 40) He reported that the anxiety and depression affect his concentration, focus, and memory. (*Id.* at 42) Plaintiff explained he could have the television or music on but was not "paying attention or anything," and had no interest.

He reported that he took Citalopram and Abilify for depression each day. (Doc. 9-3 at 43) In addition, Plaintiff said he attended mental counseling "about once a month" and had been doing so for "a year and half, two years." (*Id.* at 46)

///

---

[5] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

8

## C.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of December 15, 2011. (Doc. 9-3 at 13) At step two, the ALJ found Plaintiff's severe impairments included: "left shoulder arthritis, history of left clavicle resection surgery, left knee bursitis, and low back strain." (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.* at 16) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk 6 hours in an 8-hour work day, occasionally climb, balance, crouch, crawl, kneel, and stoop, and occasionally reach overhead with the left upper extremity, but he must avoid concentrated exposure to extremely cold temperatures (20 CFR 404.1567(b) and 416.967(b)).

(*Id.* at 16) With these limitations, the ALJ determined Plaintiff was able to perform past relevant work as a horticulture worker and welder/supervisor. (*Id.* at 20) Further, the ALJ opined that "considering the claimant's age, education, work experience, and residual functional capacity," Plaintiff was able to perform the requirements of "jobs existing in significant numbers in the national economy." (*Id.* at 21) Thus, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 22)

## DISCUSSION AND ANALYSIS

Plaintiff contends the ALJ erred at step two of the sequential evaluation in finding that his mental impairments were "nonsevere." (Doc. 13 at 8-10) According to Plaintiff, the ALJ "erred by rejecting Dr. Izzi's opinion" in reaching this conclusion. (*Id.* at 13) On the other hand, the Commissioner argues the step two determination "was supported by substantial evidence in the record," and "Plaintiff has not met his burden at step two to prove her alleged mental impairments were severe impairment during the relevant period." (Doc. 16 at 10)

## A.     Step Two Findings

The inquiry at step two is a *de minimus* screening for severe impairments "to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)). The purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled even if age, education, and experience are considered. *Bowen*, 482 U.S. at 153 (1987). At step two, a claimant must make a "threshold showing" that (1) he has a medically

determinable impairment or combination of impairments and (2) the impairment or combination of impairments is severe. *Id*. at 146-47; see also 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, the burden of proof is on the claimant to establish a medically determinable severe impairment. *Id.*; *see also Bray v. Comm'r of Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) ("The burden of proof is on the claimant at steps one through four...").

An impairment, or combination thereof, is "not severe" if the evidence establishes that it has "no more than a minimal effect on an individual's ability to do work." *Smolen*, 80 F.3d at 1290. The Ninth Circuit explained: "The mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993). A medical diagnosis alone "does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities." *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011). For an impairment to be "severe," it must limit the claimant's physical or mental ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1520(c), 416.920(b). Specifically, basic work activities include "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations, and [d]ealing with changes in a routine work setting." 20 C.F.R. §§ 404.1521(b), 416.921(b).

1.     "Paragraph B" criteria

The "paragraph B" criteria set forth in 20 C.F.R., Pt. 404, Subpart P, App. 1 are used to evaluate the mental impairments of a claimant, and include: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *See id.* The Regulations inform claimants:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

20 C.F.R. § 404.1520a(d)(1). The ALJ concluded Plaintiff had "mild limitation" in activities of daily living; social functioning; and concentration, persistence, or pace. (Doc. 9-3 at 15) Plaintiff had no episodes of decompensation. (*Id.*) As a result, the ALJ concluded Plaintiff's mental impairments do not "cause more than minimal limitations in the claimant's ability to perform basic work activities; thus,

they are non-severe." (*Id.* at 14) Plaintiff contends the ALJ erred in rejecting the opinions of Dr. Izzi in reaching this conclusion, and asserts the conclusion lacks the support of substantial evidence.

2. <u>ALJ's evaluation of Dr. Izzi's opinion</u>

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ and may be discounted whether another physician contradicts it. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). The opinion of Dr. Izzi was contradicted by non-examining physicians, Drs. Hartley and Garcia. Consequently, the ALJ was required to set forth specific and legitimate reasons for rejecting the opinions articulated by Dr. Izzi.

Examining the medical evidence, the ALJ summarized the conclusions of Dr. Izzi and explained that she gave "little weight" to the conclusion that Plaintiff had "moderate limitations in his ability to get along with peers and be supervised in a work-setting, and limitations in his ability to perform a

11

complex task on a consistent basis." (Doc. 9-3 at 14) The ALJ asserted, "These conclusions are inconsistent with the mental health treatment records and Dr. Izzi's mental status examination of the claimant." (*Id.*)

### a. Inconsistencies with Dr. Izzi's findings

The Ninth Circuit has determined an opinion may be rejected where there are internal inconsistencies within a physician's report. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999). The ALJ failed to explain how Dr. Izzi's findings during the examination were inconsistent with his conclusions related to Plaintiff's memory and concentration limitations. Indeed, while the ALJ noted Plaintiff "had no difficulty recalling five digits forward or three digits backward, [or] spelling 'world' forward," she failed to acknowledge that Plaintiff did not recall all *words* given to him—in contrast to the numbers—and "committed two errors spelling 'world' backwards." (*Compare* Doc. 9-3 at 14 *with* Doc. 9-12 at 37) Likewise, the ALJ did not explain how the examination findings were inconsistent with Dr. Izzi's conclusions related to Plaintiff's social functioning. Consequently, the purported inconsistencies do not support the ALJ's decision to give Dr. Izzi's conclusions little weight.

### b. Inconsistencies with the record

An ALJ may reject limitations "unsupported by the record as a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). When an ALJ believes a physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

The ALJ asserted the conclusions of Dr. Izzi were inconsistent "with the mental health treatment records." (Doc. 9-3 at 14) In making this finding, the ALJ noted that Plaintiff "told his psychotherapist on September 5, 2014, that he has no trouble at all concentrating on things such as

reading the newspaper or watching television; and feels that deep breathing exercises help to relax him when he has a bout with anxiety." (*Id.* at 15) Notably, Plaintiff also reported that he simply is not paying attention when watching television, because he had no interest. (*See id.* at 42) Thus, this notation in the treatment record offers limited support to rejecting the conclusion related to Plaintiff's ability to concentrate.

Moreover, the ALJ failed to identify any treatment records that contradict Dr. Izzi's findings related to concentration and social functioning. Although the ALJ recognized Plaintiff's treating physician gave him a GAF score of 50, which the ALJ rejected, she failed to recognize that he also repeatedly received GAF scores of 55 from his treating psychiatrist, Dr. Kawase. (*See* Doc. 9-13 at 21 [March 5, 2013]; Doc. 9-3 at 14 [May 7, 2013]; Doc. 9-18 at 37 [October 11, 2013]). This GAF score indicates Plaintiff had "*moderate* symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR *moderate* difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *DSM-IV* at 34 (emphasis added). Thus, the treatment records from Dr. Kawase support Dr. Izzi's opinion that Plaintiff "would be *moderately* limited" with his "ability to get along with peers or be supervised." (*See* Doc. 9-12 at 37, emphasis added)

Because the ALJ failed to identify specific inconsistencies between the opinions of Dr. Izzi and the "overall medical evidence," this reason cannot support the decision to give less weight to the limitations related to Plaintiff's memory, concentration, attention span, and social functioning.

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the ALJ failed to identify legally sufficient reasons for rejecting the limitations assessed by Dr. Izzi. Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence to determine Plaintiff's mental residual functional capacity. *See Moisa*, 367 F.3d at 886.

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence at step two, and the decision cannot be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Based upon the foregoing, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Lucio Gomez and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **August 1, 2017**     **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE